UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JULIUS LEE,

                                        Plaintiff,

                                                                                      DECISION AND ORDER

                                                                                       02-CV-6177L

              v.

MARK FREDERICK, et al.,

                                        Defendants.
_____

       Plaintiff, Julius Lee, appearing *pro se*, commenced this action under 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges violations of his constitutional rights during 2001 and 2004, while plaintiff was confined at Five Points Correctional Facility ("Five Points"). Defendants Mark Frederick and Kimberly Kulman, who at all times relevant to this lawsuit were employed by DOCS at Five Points as a physician assistant and a registered nurse, respectively, have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted.[1]

_____

      [1]Defendant Kuhlman has also moved for a protective order as to some of plaintiff's requests for admissions and written deposition questions. Even if I were to deny Kuhlman's motion, that would not affect my conclusion that she is entitled to summary judgment, for the reasons stated in the body of this Decision and Order. The motion for a protective order is

                                                                                                                                                                                        (continued...)

**FACTUAL BACKGROUND**

On June 3, 2001, plaintiff was administered a test for tuberculosis ("TB"), pursuant to established DOCS policy. Amended Complaint ¶ 9; Frederick Decl. (Dkt. #79) ¶ 4. Although the results were negative, DOCS policy called for plaintiff to be placed on "TB hold" unless he consented to take TB medication, because other test results indicated that plaintiff's immune system was not functioning properly, which rendered the test results less reliable than they would otherwise have been. According to defendants, TB hold is intended to "isolate[] an inmate from the rest of the prison population for the purpose of preventing the transmission of TB to other inmates and staff." Frederick Decl. ¶ 11.

Plaintiff initially refused to take the TB medication. Plaintiff's Statement of Material Facts ("PSMS") (Dkt. #83-2) ¶ 2; Frederick Decl. ¶ 14. He was therefore placed on TB hold. PSMS ¶ 3; Frederick Decl. ¶ 15.

On June 17, 2001, plaintiff agreed to take the TB medication. Amended Complaint ¶ 12; Frederick Decl. ¶ 17. He was then released from TB hold, and continued on TB medication. Amended Complaint ¶ 13; Frederick Decl. ¶ 18. Plaintiff spent about five or six days on TB hold. Complaint ¶¶ 10-13; Plaintiff's Depo. Tr. ("Tr.") at 16; Frederick Decl. ¶ 16.

While on the TB medication, plaintiff complained to medical staff about certain physical problems that he was experiencing, such as headaches and other pains. Amended Complaint ¶ 16; Frederick Decl. ¶ 20. Plaintiff was seen on June 27, 2001 by Frederick, who concluded that these

---

[1](...continued)
therefore denied as moot.

were side effects of the TB medication, and prescribed medication for plaintiff's symptoms. Frederick Decl. ¶ 21; Plaintiff's Exhibits (Dkt. #83-4) at 10.

On the morning of August 3, 2001, plaintiff asked the officer on duty that he be placed on emergency sick call because plaintiff had no vision in his left eye. Amended Complaint ¶ 19; Frederick Decl. ¶ 26. Defendant Kuhlman came to plaintiff's cell and, after speaking with plaintiff, she left, stating that she would notify Frederick.

Frederick arrived at plaintiff's cell early in the afternoon of August 3. After examining plaintiff, Frederick had plaintiff taken to the Cayuga Medical Center emergency room, where plaintiff was diagnosed with anterior uveitis, an inflammation in the front part of the eye. Plaintiff was treated for his condition there and continued to receive treatment following his transfer to Attica Correctional Facility in September 2001. Amended Complaint ¶ 21. Plaintiff recovered and does not suffer any lasting effects on his vision. Tr. at 38, 46; Plaintiff's Opposing Statement of Material Facts (Dkt. #83-2) ¶ 29.

Based on these facts, plaintiff asserts a single cause of action alleging that defendants violated his rights under the Eighth Amendment to the United States Constitution.[2] Although the

---

[2]The complaint also alleges that defendants violated plaintiff's rights under the Ninth and Fourteenth Amendments. The facts alleged by plaintiff cannot support a claim under the Ninth Amendment, which "has never been applied to prevent the denial of medical treatment to prisoners." *Muniz v. Goord*, No. 9:04-CV-0479, 2007 WL 2027912, at *9 (N.D.N.Y. July 11, 2007); *see also Diaz v. City of New York*, No. 00-CV-2944, 2006 U .S. Dist. LEXIS 93923, at *21-22 (E.D.N.Y. Dec. 29, 2006) ("the Ninth Amendment is a rule of construction, not one that protects any specific right, and so no independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action") (internal quotation marks and citations omitted). In addition, the Fourteenth Amendment is relevant to this case only insofar as that amendment's Due Process Clause makes the Eighth Amendment's bar on cruel and unusual punishment applicable to the states. *Johnson v. Wright*, 234 F.Supp.2d

(continued...)

amended complaint does not articulate the basis for these claims with great particularity, it appears from plaintiff's papers in opposition to defendants' summary judgment motion that plaintiff's claims are essentially twofold.

The first claim arises out of plaintiff's placement on TB hold. The gist of the claim appears to be that plaintiff was "forced" to take TB medication, Amended Complaint ¶ 26, by placing him on TB hold when he initially refused to do so. Plaintiff asserts that defendants had no sound medical reasons for placing him on TB hold. He alleges that defendants did not even follow their own purported policy of isolating inmates on TB hold, because throughout the time that plaintiff was on TB hold, he shared a cell with another inmate, who had no restrictions on his coming and going, aside from those placed on all inmates. Plaintiff's Memorandum of Law (Dkt. #83-1) at 3, 9; Dkt. #83-2 ¶ 6; Plaintiff's Declaration (Dkt. #83-3) ¶ 8. Plaintiff also asserts that "[b]y confining plaintiff [sic] to his cell on T.B. hold, and allowing plantiff cellmate [sic] to come and go as [he] pleased with no restrictions [defendants] punished plantiff for not taking said medications." Dkt. #83-2 ¶ 10.

The second component of plaintiff's claims relates to his loss of vision on August 3, 2001. Plaintiff alleges that after Kuhlman left his cell on the morning of that day, plaintiff was left unattended for about six to seven hours before he was seen by Frederick at around 1:30 p.m. Plaintiff alleges that this delay in providing him with treatment constituted deliberate indifference to plaintiff's serious medical needs, in violation of his rights under the Eighth Amendment. *See* Dkt.

---

[2](...continued)
352, 358 (S.D.N.Y. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 101 (1976)). Accordingly, the Court treats plaintiff's pleadings as raising only a claim under the Eighth Amendment. *See Estelle*, 429 U.S. at 101; *Flemming v. Wurzberger*, 490 F.Supp.2d 320, 321 n. 2 (W.D.N.Y. 2007).

#83-1 at 5, 9; Dkt. #83-2 ¶¶ 21, 22; Dkt. #83-3 ¶¶ 15, 20.  Plaintiff alleges that he was in "excuriating [sic] pain" during that time.  Dkt. #83-2 ¶ 26.

**DISCUSSION**

**I. Eighth Amendment Claims:  General Principles**

To show that prison medical treatment was so inadequate as to amount to "cruel and unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendant's actions or omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  To establish such a claim, then, the prisoner must prove (1) the existence of a serious medical need and (2) defendants' deliberate indifference to that need.

The Second Circuit has stated that a medical need is "serious" for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2$^d$ Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2$^d$ Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995)).  Among the relevant factors for determining whether a serious medical need exists are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

"[W]here the prisoner is receiving appropriate on-going treatment for his condition, but ... brings a ... denial of medical care claim based on a temporary delay or interruption in treatment," the Second Circuit has explained that the "serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter*, 316 F.3d 178, 186 (2$^d$ Cir. 2003) (footnote omitted). The court in *Smith* added that "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Id.* Nevertheless, the court added that significant "risks may be absent ... where the alleged lapses in treatment are minor and inconsequential," *id.*, and that "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.

The "deliberate indifference" component, as explained by the Supreme Court, includes both an objective and subjective element. *Wilson v. Seiter*, 501 U.S. 294, 298-299 (1991). With respect to the objective aspect, the court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights. *Id.* "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 298 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Thus, Eighth Amendment protection is limited to "a condition of urgency that may result in degeneration or extreme pain." *Chance*, 143 F.3d at 702.

With respect to the subjective aspect, the court must consider whether the deprivation was brought about by defendants in wanton disregard of those rights. *Wilson*, 501 U.S. at 298-99. To establish indifference of a constitutional magnitude, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain. *See id.* at 299; *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991); *Ross v. Kelly*, 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040 (1992).

The Court in *Estelle* also cautioned that mere negligence is not actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eight Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind," *id.* at 102, or "incompatible with the evolving standards of decency that mark the progress of a maturing society," *id.* at 105-06. It is clear, then, that allegations of malpractice alone do not state a constitutional claim. *Id.* at 106 n. 14; *Chance*, 143 F.3d at 703-04; *Ross*, 784 F.Supp. at 44.

Likewise, an inmate's "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *see also Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("The courts will not intervene upon allegations of mere negligence, mistake or difference of opinion").

**II. TB Hold**

Although plaintiff makes a number of allegations concerning the wrongfulness of his placement on TB hold and defendants' requirement that he take TB medication as a condition of his release from TB hold, the core of this claim appears to be plaintiff's assertion that, because the tests that were administered to him were all negative for TB, there was no sound medical justification for either the TB hold or the TB medication.

Defendants do not appear to dispute that plaintiff never tested positive for TB. They contend, however, that they were justified in giving plaintiff a choice between taking TB medication or going on TB hold because plaintiff had a condition that affected the functioning of his immune system. Frederick states in his declaration that because of that condition, plaintiff was required to undergo "anergy testing," which would reveal whether his immune system was functioning properly.[3] Plaintiff's anergy test indicated that his immune system was not functioning properly, which meant that defendants were not able to confirm that he had not been exposed to TB. Frederick Decl. ¶¶ 9, 10. As a result, plaintiff was required either to take TB medication or be place on TB hold. *Id.* ¶ 11.

Plaintiff does not dispute that he has a condition that affects his immune system; *see* Amended Complaint ¶ 9; Tr. at 7. He also has submitted no evidence, nor does he even allege, that defendants' assertion that this condition and the results of his anergy test cast some doubt upon the

---

[3]An anergy test involves injecting a common antigen such as mumps, candida, or trichophytin just under the skin. If the patient's immune system is reacting properly to antigens in general, within 48 to 72 hours after the injection the skin will appear red or irritated where the antigen was injected. The purpose of the test is to control for some other skin test, such as a TB test, to make sure the other test is not giving a "false negative" result. *See* http://www.nlm.nih.gov/medlineplus/ency/article/003842.htm; *see also Judge v. Medical Department at S.C.I. Greene*, No. 05-1776, 2007 WL 1576400, at *3 n. 2 (W.D.Pa. May 31, 2007) (taking judicial notice of medical definition at National Library of Medicine website).

reliability of his TB test results. Plaintiff seems simply to allege that in spite of his condition, defendants were unjustified in requiring him to take TB medication or be place on TB hold.

Virtually the only evidence plaintiff presents in support of that allegation is that while he was on TB hold, plaintiff shared a cell with another inmate. Plaintiff argues that this belies defendants' assertion that it was necessary to isolate him from the rest of the prison population.

At the direction of the Court, defendants have submitted a declaration of Lester N. Wright, M.D., who has been the Chief Medical Officer of DOCS since July 1995. He states that at the time of the events in question, "it was preferable that inmates on TB hold be placed in a single cell or in the alternative to be placed together (cohorted) in a cell with another TB hold inmate." Wright Decl. (Dkt. #88) ¶ 4. He adds, however, that "an asymptomatic inmate on a TB hold ... would be allowed to be double bunked with an inmate from the general population, if necessary, due to the lack of single cells, as long as weekly symptom checks and stethoscope examinations were done and the placement was for a limited time." *Id.*

In support of those assertions, defendants have also submitted a copy of a July 1999 email message from one DOCS employee to another asking whether an incoming inmate, who was on TB hold, was asymptomatic, but refused to submit to PPD screening, could be double-bunked with another inmate. The message was eventually forwarded to Dr. Wright, who responded in part that "while it is preferable to cohort tuberculin hold people, the magnitude of the risk is such that we can allow tuberculin hold inmates to be put in double cells. If so, I'd like to be sure that we have weekly symptom checks and stethoscope examination of their lungs." Dkt. #88 Ex. A.

Having reviewed Dr. Wright's declaration, and all the evidence in the record, I find that even if that evidence is viewed in the light most favorable to plaintiff, the nonmoving party, defendants are entitled to summary judgment on plaintiff's claim concerning his placement on TB hold.

First, "there is no dispute that NYDOCS has a legitimate, neutral interest in containing tuberculosis." *Word v. Croce*, 230 F.Supp.2d 504, 511 (S.D.N.Y. 2002); *see also Jolly v. Coughlin*, 76 F.3d 468, 477 ($2^d$ Cir. 1996) (correctional officials have an affirmative obligation to protect inmates from infectious diseases).

Second, it was plainly reasonable for defendants to place plaintiff on TB hold, in light of the fact that the condition of his immune system was such that defendants could not place complete confidence in the negative results of his TB test results. *See Word*, 230 F.Supp. at 512 (DOCS's placement of plaintiff on TB hold was reasonable where DOCS was "unable to determine the extent to which Plaintiff pose[d] a risk of contagion"); *cf. Reynolds v. Goord*, 103 F.Supp.2d 337, 337-38 (S.D.N.Y. 2000) (finding it irrational to place on TB hold inmate who refused to submit to PPD testing on religious grounds, where other diagnostic tools to which plaintiff did submit, such as a chest x-ray, sputum testing, and physical examination, indicated that plaintiff was negative for TB).

Third, if conditions at the facility made it impracticable to completely isolate plaintiff from the rest of the inmate population, on the record before me I do not believe that a factfinder could reasonably conclude that it was irrational for defendants to at least limit plaintiff's exposure to other inmates, even if that meant double-bunking him, for a short time, with a non-infected inmate. *See Selah v. Goord*, 255 F.Supp.2d 42, 54 (S.D.N.Y. 2003) ("That DOCS permits some contact between the individual [inmate on TB hold] and other people does not destroy this goal" of limiting number

of people who are exposed to inmate); *Davis v. City of New York*, 142 F.Supp.2d 461, 464 (S.D.N.Y. 2001) ("That the City chose not to incur the ... cost and burden of placing plaintiff in absolute physical and respirational isolation does not mean that the [partial] isolation it did impose was unrelated to securing the health and safety of the prison population").

Plaintiff also alleges that he asked defendants for a copy of the DOCS policy concerning TB hold, and that he was never provided with a copy of such a policy. This claim is meritless. The Court is aware of no authority standing for the proposition that inmates have a right to receive a written copy of DOCS policies concerning actions that are not to their liking. In any event, what matters here is defendants' actions toward plaintiff, *i.e.*, their placement of plaintiff on TB hold until he consented to take TB medication, not whether they showed him a written policy authorizing those actions.

Finally, to the extent that plaintiff alleges that his living conditions while he was on TB hold constituted cruel and unusual punishment in violation of the Eighth Amendment, I find no merit to that claim. Although plaintiff suffered some loss of privileges while he was on TB hold, particularly with respect to his freedom of movement, he has not presented any evidence that he was subjected to such a serious deprivation, or that defendants acted with a sufficiently culpable state of mind, as to give rise to an Eighth Amendment claim. *See Delisser v. Goord*, No. 902CV00073, 2003 WL 133271, at *6 (N.D.N.Y. Jan. 15, 2003) (dismissing inmate's Eighth Amendment claim based on confinement to medical keeplock for refusing to take TB test or TB medication, where only prison condition plaintiff complained about involved denial of his "regular" commissary privileges during his time in keeplock); *see also Trammell v. Keane*, 338 F.3d 155, 161 (2$^d$ Cir. 2003) (to prove Eighth

Amendment violation, inmate must show both that he was "denied 'the minimal civilized measure of life's necessities,'" and that defendants "possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *Allah v. Poole*, ___ F.Supp.2d ___, 2007 WL 2317566, at *14 (W.D.N.Y. 2007) (stating that plaintiff "ha[d] not alleged living conditions in IPC that 'jeopardize[d his] health or safety' so as to give rise to an Eighth Amendment claim") (quoting *Johnson v. Hannah*, 421 F.Supp.2d 604, 607 (W.D.N.Y. 2006)).

**III. Plaintiff's Claim Concerning his Loss of Vision**

I also find that defendants are entitled to summary judgment on plaintiff's claims concerning his loss of vision on August 3, 2001. Based on the allegations of the complaint, this claim could only be asserted against Kuhlman and Frederick, the only two defendants who are alleged to have done anything in connection with the events giving rise to this claim. There is no evidence, however, that would support a finding that Kuhlman or Frederick acted in violation of plaintiff's Eighth Amendment rights, or that they intended to cause him unnecessary pain.

The only factual issue that plaintiff attempts to raise in connection with this claim concerns his contention that on the morning of August 3, after plaintiff told Kuhlman that he had no vision in his left eye, Kuhlman walked away from his cell, and plaintiff was left for six or seven hours without medical attention, until Frederick came to his cell in the afternoon. Kuhlman states in her declaration that she saw plaintiff at about 9:30 a.m. that day, Dkt. #74 ¶ 5, and Frederick states that after Kuhlman told him about plaintiff's complaints, Frederick arrived at plaintiff's cell at about 1:00

- 12 -

p.m.  Frederick Decl. ¶ 28.  Plaintiff, however, alleges that Kuhlman responded to his sick-call request as early as 6:30 or 7:15 a.m., and that Frederick showed up at about 1:30 p.m.  Complaint ¶ 19; Dkt. #83-3 ¶ 16; Tr. at 29.

Even if the times were as alleged by plaintiff, that would not support a finding of liability on this claim, and therefore any issue of fact that may exist in this regard is not material.  For one thing, as the Second Circuit has observed, "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."  *Smith v. Carpenter*, 316 F.3d 178, 187 (2$^d$ Cir. 2003).  As stated, after he was treated for his eye condition, plaintiff made a full recovery, and by his own admission he suffers no lasting ill effects.

I recognize that plaintiff alleges that he was in pain during this time.  Even assuming that to be true, however, I see no evidence that either Kuhlman or Frederick acted with the requisite culpable state of mind.  Kuhlman forwarded plaintiff's complaints about his loss of vision to Frederick, who came to plaintiff's cell and had plaintiff taken to an outside hospital, where he received appropriate treatment.  There is no indication that Kuhlman or Frederick deliberately delayed taking action for the purpose of causing plaintiff pain or prolonging his suffering.  *See Rodriguez v. Ames*, 224 F.Supp.2d 555, 561 (W.D.N.Y. 2002) ("Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment'") (quoting *Rodriguez*

*v. Mercado*, No. 00 CIV. 8588, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002)) (citation omitted); *see also Palacio v. Ocasio*, No. 02Civ.6726, 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006) (where delay in treatment was, at most, a little more than two hours, and "nothing in the record suggest[ed] that [plaintiff] suffered from a life-threatening or fast-degenerating condition or that prison officials deliberately delayed his treatment as a form of punishment," court found as a matter of law that delay did not rise to the level of deliberate indifference); *Davidson v. Harris*, 960 F.Supp. 644, 648-49 (W.D.N.Y. 1997) (stating, in context of plaintiff's claim that he was forced to wait six to eight hours before receiving oxygen and pain medication for non-life-threatening stab wounds to his back, chest and head, that "[a]s any lay person is well accustomed, patients are frequently faced with delays in receiving medical care, particularly when their medical condition is not grave.  Based on the facts and evidence provided by both sides, no reasonable person could find a wanton disregard or deliberate indifference of plaintiff's serious medical needs").

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #73) is granted, and the complaint is dismissed.

Defendant Kuhlman's motion for a protective order (Dkt. #52), plaintiff's motion for a "conference hearing" (Dkt. #64), and plaintiff's motion for appointment of counsel (Dkt. #65), are denied as moot.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       October 22, 2007.